**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**

| | | |
|---|---|---|
| **JOHN DOE,** | ) | **CASE NO.** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MEMORANDUM OF LAW IN SUPPORT** |
| **v.** | ) | **OF MOTION FOR A PRELIMINARY** |
| | ) | **INJUNCTION** |
| **MISSISSIPPI STATE UNIVERSITY,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

Plaintiff John Doe ("John") requests that this Court grant him a preliminary injunction, vacating the four-year suspension imposed by Defendant Mississippi State University ("MSU") and upheld by Defendant Dr. Thomas Bourgeois ("Dr. Bourgeois") (collectively, the "MSU Defendants"), and removing all record of the sanction and disciplinary action from John's academic record. As shown below, MSU subjected John to disparate treatment throughout the disciplinary process due to John's gender. Dr. Bourgeois, in his official capacity as MSU Dean of Students, failed to ensure that John received the due process protections to which he is entitled under the law.

## I.    INTRODUCTION

MSU commenced an investigation after a false allegation of sexual misconduct was filed by Jane Roe ("Jane"), a former girlfriend who was bitter that John ended their relationship. MSU's investigation, as overseen by Dr. Bourgeois, was superficial and designed to corroborate Jane's allegation rather than determine its veracity. MSU repeatedly violated university policy, including by denying John the right to have an advisor at his only investigative meeting, by denying John the right to introduce evidence in support of his claims, and by naming the case investigators as witnesses to John's statements during the meeting, even though they lacked documentary evidence. In contrast to MSU's treatment of John, MSU took Jane's word for

granted and gave her the tools to support her false allegation by admitting irrelevant evidence, giving her multiple meetings with MSU investigators, and letting her tailor her story in response to John's. MSU further declined to investigate or sanction Jane for filing a false report, as John repeatedly claimed. In so doing, MSU subjected John and Jane to disparate treatment due to their sex.

Dr. Bourgeois, in his official capacity as Dean of Students, failed to ensure that John's due process rights were protected during the process. MSU, under Dr. Bourgeois' supervision, failed to give John proper notice of the allegations against him and failed to give John a meaningful opportunity to be heard by rejecting all exculpatory evidence and overlooking all inconsistencies in the case against him. MSU subjected John to a four-year suspension, a life-altering sanction that was disproportionate and unwarranted given the clear weaknesses in the case against him. Dr. Bourgeois later affirmed this sanction and denied John's appeal, without providing any rationale. Because the preponderance of the evidence supports that John was not responsible, MSU's sanction was arbitrary and shocks the conscience. Dr. Bourgeois oversaw a disciplinary process that failed to provide John with basic protections.

With no remaining options, and his reputation, academic career, and job prospects jeopardized, John seeks relief from this Court. He meets all requisite elements for an injunction as he has a high likelihood of success on the merits of his claims against the MSU Defendants,[1] he is facing significant irreparable harm, the balance of hardships weighs in his favor, and injunctive relief will serve public interest. John respectfully requests an order vacating the unlawful sanction and removing any reference to the same from his academic record.

---

[1] John additionally has a high likelihood of success on his claims against Jane, though injunctive relief is sought against the MSU Defendants only.

## II.    FACTUAL BACKGROUND

John incorporates the facts as described in his Complaint as if fully restated herein.

### A.  John and Jane's Tumultuous Relationship

John is a mechanical engineering student at MSU and just three semesters away from graduation. He met Jane towards the end of the 2019 spring semester and the two began seeing each other. Upon returning to school for the fall semester, the relationship became more serious. John and Jane eventually informed John's family that they were making plans for marriage. Throughout the relationship, John and Jane had consensual sexual intercourse on a near daily basis.

Seemingly happy on its face, the relationship, in reality, was destructive for John's health and personal life. Jane was demanding and manipulative, requiring constant emotional support from John at the expense of his grades, employment prospects, and even his own mental health. Prior to meeting Jane, John was good student in a rigorous field of study with a 3.3 GPA. However, his relationship with Jane created such strain that he failed the 2019 Fall Semester with a .6 GPA. Consequently, John lost the opportunity to participate in a co-op the following semester. The relationship forced John to seek medical intervention for his declining mental state, and he received medication for the same. In an effort to turn his life around, John ended the relationship with Jane.

John's decision to end of the relationship provoked Jane, who then sent him a flood of emails, text messages, and voicemails berating him for his decision. Jane was entirely unreceptive to John's explanations that he ended the relationship for the sake of his academic career and personal health.  She subsequently took further action to derail John's academic and personal life. In retaliation for the break up, Jane filed a false report with MSU's Office of

Compliance & Integrity, alleging that John had sexually assaulted her in violation of MSU Operating Policy 3.04 (the "Policy"). Jane offered no date that this assault allegedly occurred, and she never narrowed the timeframe more than a four-day period. To this day, Jane has not identified the date of her alleged assault.

### B. The Disciplinary Process Immediately Placed John at a Disadvantage

Jane's report set the disciplinary process in motion. MSU entrusted Dr. Bourgeois with the responsibility of maintaining appropriate standards of student conduct. *See* MSU Code of Student Conduct, Exh. 1 to the Complaint, at pg. 3. Dr. Bourgeois is also responsible for initiating, implementing, and supervising the disciplinary process for MSU students. *Id.* Under Dr. Bourgeois' supervision, Assistant Director, Office of Student Conduct Nick Gordon ("Mr. Gordon") emailed John to request a meeting. Mr. Gordon's email contained no information about the purpose of the meeting, let alone inform John that a serious allegation had been made against him. *See* Exh. 3 to the Complaint.

MSU did not inform John of Jane's allegation of sexual assault until he was physically present at the meeting with Mr. Gordon and Compliance Specialist Lateshia Butler ("Ms. Butler"). This meeting violated the Policy: MSU failed to give John sufficient notice and John was denied the right to have an advisor with him at the meeting. During the meeting, which lasted only 30-40 minutes, Mr. Gordon and Ms. Butler asked very few questions and took minimal notes. Rather, John, completely blindsided by the allegation, was caused to ramble, describing his tumultuous relationship with Jane and openly wondering why she filed a false report. Dr. Bourgeois' failure to ensure that John received the protections required by the Policy and federal law led to John's statements being used against him.

**C. The Hearing Memorandum Contained Fatal Mistakes That John was Prevented From Correcting**

The Policy requires that a hearing memorandum include relevant policy sections, undisputed and disputed facts, potential witnesses, and exhibits. MSU prepared three memorandum hearing drafts, all which put John in a worse position than the one before. The first draft (the "April 7th Memorandum") contained numerous misrepresentations of John's statements and even falsehoods. For example, the April 7th Memorandum stated that John and Jane agreed to numerous facts about "that night." **Yet, no date for the night in question was ever specified**. The date of the alleged incident was of particular importance given that John and Jane had spent most nights of the 2019 Fall Semester together. The April 7th Memorandum also contained other incorrect statements, including that John acknowledged a statement by Jane that she did not want to have sexual intercourse "that night" and that following the "incident," John "apologized" to Jane. In fact, John flatly denied all such claims. The April 7th Memorandum did note that the "alleged assault was not discussed" in the numerous communications between John and Jane following the breakup, but drew no inferences from the fact that John and Jane continued to communicate regularly. Further, the memorandum incorrectly stated that Jane "agreed" to John's ending the relationship, ignoring all evidence that the breakup had sent Jane into a tailspin.

Responding to the April 7th Memorandum, John provided many factual corrections, as well as a position statement describing his relationship with Jane. John also submitted emails, text messages, and voicemail transcripts from Jane following their breakup to demonstrate that she did not agree to the breakup and intentionally filed her report to harm John. In response to John's submission of evidence, MSU Director of Title IX and EEO Programs Brett Harvey ("Mr. Harvey") emailed John and explained that he (Mr. Harvey) was tasked with reviewing

memorandum edits and making decisions regarding admissible evidence. Shockingly, Mr. Harvey claimed that John's edits differed "substantially" from the investigators' accounts, who apparently had reported that John "confessed." Therefore, Mr. Harvey stated that Mr. Gordon and Ms. Butler's account would be included in the revised memorandum (the "April 16th Memorandum") and the two would serve as witnesses as to John's statements at the hearing. MSU made this decision even though the investigators took no comprehensive notes during the interview and therefore had no record, aside from memory, as to John's statements.

Even more absurdly, Mr. Harvey declined to admit any of John's submitted evidence, falsely claiming that the "details of the breakup between the parties are not directly relevant to that question [whether sexual contact occurred without consent]." Mr. Harvey ignored John's repeated explanations that the details of the breakup demonstrated that no sexual assault ever occurred. In disregarding this evidence entirely, MSU failed to consider that Jane had filed a false report in violation of the Policy. MSU therefore simultaneously ensured that John could not defend himself and that Jane would not be investigated or charged with filing a false report.

The April 16th Memorandum included the investigators' account, which consisted of a recitation of "statements" by John that were misconstrued or taken out of context. For example, the investigators claimed that John stated he was drinking "that night," when John had only discussed drinking with Jane generally and, again, no date was ever specified. As MSU's wrongful actions unfolded, Dr. Bourgeois failed to intervene, thus making it impossible for John to establish his innocence.

Compounding matters, MSU circulated the April 16th Memorandum with some of John's edits and his position statement, even though Jane had failed to submit anything. Jane did not provide her position statement until the third draft (the "April 23rd Memorandum"). By

circulating John's statements before Jane had submitted her statement, MSU enabled Jane to tailor her response to John. In her position statement contained in the April 23rd Memorandum, for the first time, Jane alleged the incident occurred between November 27, 2019 and December 1, 2019.

The April 23rd Memorandum also contained a new witness: a friend of Jane's to whom she had alleged given details about the incident (the "Friend"). Mr. Harvey admitted that the Friend's testimony was not "directly related" to the issue of consent, but nonetheless concluded it should be admitted into evidence. Mr. Harvey admitted a favorable witness for Jane even though he recently denied John the ability to introduce any evidence to support his story. MSU also failed to admit testimony by the other witness included in Jane's report: John's roommate (the "Roommate"). Investigators met with the Roommate, who immediately defended John. MSU never met or spoke with the Roommate again, as his testimony was inconsistent with Jane's narrative.

**D. MSU Finds John Responsible and Dr. Bourgeois Upholds John's Sanction With No Explanation**

After a flawed investigative process, a hearing took place and MSU found John responsible for violating the Policy. MSU offered no rationale for its decision or the sanction imposed – a four-year suspension. Within days, John submitted a request for an appeal. He identified numerous procedural flaws that made it impossible for him to receive a fundamentally fair hearing. John explained the detriment to him created by investigator bias, the wrongful exclusion of evidence, and the inaccuracies within the hearing memorandum. Nevertheless, Dr. Bourgeois denied John's request for an appeal.  Dr. Bourgeois offered no explanation for his denial beyond a claim that John failed to meet the standard for appeal.

With his administrative options exhausted and facing irreparable damage to his academic, career, and employment prospects, as well as his reputation, John filed the instant litigation. He now moves for injunctive relief and respectfully asks this Court to vacate his four-year suspension and remove any reference to the discipline from his academic record.

## III.    LAW & ARGUMENT

As shown below, John can satisfy each of the elements required for the issuance of a preliminary injunction. Accordingly, this Court should grant his Motion and direct MSU and Dr. Bourgeois to vacate John's suspension and remove all references to the disciplinary process from John's academic record.

To obtain a preliminary injunction pursuant to Fed. R. Civ. P. 65, which serves to preserve the *status quo* pending a final trial on the merits, a movant must establish the following: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest. *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009). These four factors do not have a fixed value, and courts should instead apply a "sliding scale" approach, "which takes into account the intensity of each in a given calculus." *Texas v. Seatrain International, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975).

### A.  John Has A Strong Likelihood Of Success On The Merits.

"To show a likelihood of success on the merits, the plaintiff must prove a *prima facie* case, but need not prove that he is entitled to summary judgment." *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 582 (5th Cir. 2013). John has a strong likelihood of success on each of his claims against MSU.

1. **Title IX**

    a. **Legal Standard**

Title IX provides that no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any education program receiving Federal financial assistance. 20 U.S.C. § 1681. Courts have developed numerous theories through which a Title IX claim may be proved, one of which is the erroneous outcome theory. "A plaintiff who claims that an erroneous outcome was reached must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." *Doe v. Univ. of Miss.*, 361 F. Supp. 3d 597, 607 (S.D. Miss. Jan. 16, 2019), *citing Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994). Further, a plaintiff must allege "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Doe v. Univ. of Miss.* at 607. Gender bias may be demonstrated by introducing "particular evidentiary weaknesses behind the finding such as motive to lie on part of the complainant or witnesses." *Pacheco v. St. Mary's Univ.*, 2017 U.S. Dist. LEXIS 94510 at *47 (W.D. Tex. June 20, 2017). Even though public universities are not courts of law, motive is equally important and powerful evidence that should be admitted. Indeed, courts consistently permit evidence that speaks to motive, even where it would otherwise be subject to exclusion.[2] Further, a party can also demonstrate gender bias by introducing evidence of "procedural flaws or statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.* (internal quotations omitted).

---

[2] John notes that the Federal Rules of Evidence permit evidence of a crime, wrong, or other act to show motive, even where it would otherwise be deemed inadmissible as character evidence. Evid.R. 404(b)(2). Evidence of motive is further an exception to the rule against hearsay and admissible to demonstrate to the declarant's state of mind. Evid.R. 803(3).

In a recent, highly similar case, the Sixth Circuit reversed the dismissal of a male student's Title IX claim, finding the student presented a convincing case of gender discrimination under the erroneous outcome theory. *Doe v. Oberlin College*, No. 1:17-cv-01335 (6th Cir. 2020). In *Oberlin*, a female student accused a male student of sexual assault by a female student. Approximately two weeks after the report, Oberlin informed the male student of the charge via email. The email stated only that "the College is investigating a report" by the female student of sexual assault and provided the date of the alleged incident. Oberlin failed to inform the student of the substance of the allegations for months. The hearing panel later concluded that the preponderance of the evidence established a lack of consent throughout the sexual encounter. In response, Oberlin expelled the male student. He appealed, citing new testimony by various individuals and further challenged his sanction as overly severe. Oberlin affirmed his expulsion "with almost no explanation."

Reviewing the matter, the Sixth Circuit found that the male student alleged facts sufficient to support an inference of gender bias. Citing to the Second Circuit,[3] the Court noted that "clear procedural irregularities in the College's response to the allegations of sexual misconduct…will permit a plausible inference of sex discrimination." *Id.*, *citing Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2nd Cir. 2019) (internal quotations omitted). However, the Court found the most persuasive evidence of gender bias in the hearing panel decision itself. Finding a lack of evidence in the record to support the female student's alleged failure to consent, the Court noted that "when the degree of doubt passes from 'articulable' to grave, the merits of the decision itself, as a matter of common sense, can support an inference of sex bias."

---

[3] Courts within the Fifth Circuit regularly follow the Second Circuit precedent in Title IX cases (*see e.g. Doe v. Miss.* at *606-607, relying upon the Second Circuit's approach to erroneous outcome cases; *see also Pacheco v. St. Mary's Univ.* at fn. 8, noting that "many cases" borrow from the Second Circuit's analysis in *Yusuf v. Vassar Coll.*).

**b. John alleged particular facts sufficient to cast articulable doubt on the MSU hearing outcome.**

Here, John has alleged compelling evidence that, by discriminating against him on the basis of sex, MSU reached an erroneous outcome. Similar to *Oberlin*, John received insufficient notice. John's notice, however, was even more deficient. The *Oberlin* plaintiff understood from the notice that a female student alleged a sexual assault occurred on a specific date. In contrast, MSU's notice to John stated only that the university "received report of an incident that you may have been involved in from late November of 201[9]." Additionally, John never received notice as to when the assault allegedly occurred, and indeed a specific date was never provided. Nonetheless, like *Oberlin*, MSU proceeded to find John responsible and imposed a disproportionately harsh sanction while providing "almost no explanation."

John has identified particular facts sufficient to cast articulable doubt on the accuracy of his hearing. John has never waived from his claim that Jane filed a false report against him in retaliation for his ending the relationship, and therefore the hearing outcome was not only inaccurate, but completely unfounded. John had clear evidence of Jane's motive to file her false report in the form of text messages and emails from her, upset and angry at John after the relationship ended. By labeling such evidence as having "low or nonexistent" probative value to the issue of consent, MSU mischaracterized the purpose of this evidence. This evidence spoke directly to John's claim that the "assault" never occurred. Claiming that this evidence was not relevant to consent assumes that Jane's claim of sexual assault is true. Further, MSU noted that in these communications, the alleged assault was never discussed, but MSU failed to recognize the significance of this fact. In excluding this evidence, MSU impeded John's ability to defend himself.

Similarly, MSU resisted any attempt by John to clarify the statements he made during the investigative meeting, which the hearing memorandum misstated. Not only did MSU deny John his right to have an advisor, who could have affirmed John's statements during the meeting, but MSU denied him the right to introduce evidence in support of his claims. MSU then named the investigators as witnesses to John's statements, even though they took minimal notes and the hearing was not otherwise recorded. In only permitting half the story to be told, the accuracy of the hearing outcome is vulnerable to serious doubt.

Lastly, the accuracy of the hearing outcome is called into question given the failure to identify a precise date. To consider the preponderance of the evidence as supporting a claim that an assault occurred, when the date of the assault is never identified, is an inherent contradiction. MSU found John responsible for an act that allegedly occurred on an unknown date, which in itself casts serious doubt as to the hearing outcome's accuracy.

### c. John has alleged particular circumstances demonstrating that MSU's finding of responsibility was motivated by gender bias.

John has sufficiently demonstrated that gender bias was a factor in MSU's finding against him. Clear procedural irregularities in MSU's response to Jane's claims against John permit a plausible inference of sex discrimination. Indeed, procedural irregularities plagued the entire process. At the outset, MSU deprived John of sufficient notice of the claims against him and his right to have an advisor accompany him to the investigatory meeting. MSU violated its own promise of fairness when it denied John the right to introduce evidence in support of his claims, even as it permitted Jane to introduce evidence that it acknowledged was not "directly related" to the issue of consent. MSU further violated its guarantee of impartiality when it named the investigators as witnesses to John's statements after he called into question their misleading, and sometimes incorrect, statements in the hearing memorandum. MSU denied John's request for an

appeal, even as he met the requisite standard. The process MSU followed throughout the investigation was not the process described in the Policy.

In contrast, Jane was provided with numerous privileges that MSU denied to John. Jane met with the investigators multiple times, whereas John was only given one 30-40 minute meeting. MSU permitted Jane to introduce evidence that was not "directly related" to the issue of consent, but served to support Jane's version of events. Jane further declined to submit her position statement to MSU until after John had provided his, meaning that Jane was able to tailor her position statement in response to his. Moreover, Jane had the benefit of her word being assumed as true and her credibility being unquestioned, whereas John was doubted and his statements mischaracterized at every turn.

John possessed powerful evidence – text messages and emails – illustrating Jane's motive to lodge false allegations. By concluding that these communications did not speak to the issue of consent, MSU entirely ignored John's point that the evidence helped demonstrate that the alleged assault never even occurred. Instead, MSU followed a practice of consistently excluding John's evidence while admitting evidence put forth by Jane. Had MSU permitted John to introduce his evidence, the degree of doubt in Jane's allegations would have been grave. Moreover, in disregarding John's explanation that Jane's report was false, MSU ignored the Policy's mandate that intentionally submitting a false report is grounds for disciplinary action in itself. MSU failed to even consider that Jane had violated the Policy despite persuasive evidence, much less investigate or impose sanctions upon her. In relying on weak evidence to investigate and charge John for a Policy violation, while failing to investigate or charge Jane for a Policy violation in spite of clear evidence, MSU treated the two differently based on their sex. Because John has more than met his burden of casting doubt on the hearing outcome's accuracy and sufficiently

tied the outcome to gender bias, John is highly likely to succeed on the merits of his Title IX claim.

### 2. **Violation of Procedural Due Process**

#### a. **Legal Standard**

Dr. Bourgeois oversaw and participated in a disciplinary process that failed to protect John's due process rights.[4] Procedural due process "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Matthews v. Eldridge*, 424 U.S. 319, 331 (1976). Procedural due process "requires notice and some opportunity for hearing before a student at a tax-supported college is expelled for misconduct." *Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150, 158 (5th Cir. 1961). Further, "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures. *Matthews* at 584.

The amount of process due in university disciplinary proceedings is based on a sliding scale that considers three factors: (1) the student's interests that will be affected; (2) the risk of an erroneous deprivation of such interests through the procedures used and the probable value of additional or substitute procedural safeguards; and (3) the university's interests, including the burden that additional procedures would entail. *Id* at 335.

---

[4] John notes that Dr. Bourgeois is estopped from arguing that he is entitled to Eleventh Amendment immunity. "In *Ex parte Young*, the Supreme Court 'created an exception to Eleventh Amendment immunity for claims for prospective relief against state officials who have been sued in their official capacities.'" *Doe v. Univ. of Miss.*, 361 F. Supp. 3d 597, 604 (S.D. Miss. Jan. 16, 2019), *citing Nelson v. Univ. of Tex. at Dall*, 535 F.3d 318 320 (5th Cir. 2008). The state official must only have the power to grant the requested relief. *Univ. of Miss.* at 604. Dr. Bourgeois is sued under § 1983 in his official capacity as Dean of Students and has the power to vacate John's suspension. John's procedural and substantive due process claims are therefore properly asserted against Dr. Bourgeois.

### b. John's implicated interests are significant and entitled to substantial weight.

John has a liberty interest in the continued pursuit of his higher education. In a recent case where a male student challenged his three-year suspension on the grounds of gender discrimination and due process, the Southern District of Mississippi concluded that the student's affected interests were "easily identified." *See Doe v. Univ. of Miss.*, 361 F. Supp. 3d 597, 609 (S.D. Miss. Jan. 16, 2019). Indeed, the court acknowledged "Doe has a liberty interest in his higher education and the sanctions imposed by the University could have a substantial lasting impact on his personal life, educational and employment opportunities, and reputation in the community (internal alterations omitted)." *Id.* Here, too, John's interests are readily identifiable. John has a vested interest in completing his final three semesters of school. The sanction that followed from the disciplinary process overseen by Dr. Bourgeois, and later upheld by him, will put John's education, and his subsequent ability to obtain employment, on hold for years if allowed to stand. Burdened with the label of "sexual predator," John's reputation will suffer and untold damage will be inflicted upon his personal life. John can easily satisfy this factor.

### c. There is a high risk of erroneous deprivation of John's interests and a significant value to additional safeguards.

Second, the risk of erroneous deprivation of John's interests is high. The procedures overseen and employed by Dr. Bourgeois were not those promised by the Policy. In cutting corners, Dr. Bourgeois failed to honor John's due process rights. John was denied proper notice at the very outset of the investigation and denied notice as to the purpose of the only investigative meeting he received. Though the Policy claims that an accused student "will be advised of the charges and their rights in connection with the investigation (*see* the Policy at pg. 13)," MSU's failed to inform John of the allegation against him until he was physically in the

meeting with investigators. This deprivation resulted in an unfair ambush and could not constitute proper notice. Additionally, the fact that Jane has never identified a specific date the assault allegedly occurred means that this deficiency was never rectified. To this day, John has not received proper notice.

Moreover, MSU's refusal to admit the evidence put forth by John, in the form of emails, text messages, and voicemails from Jane upset over the end of the relationship, rendered John's ability to be heard as superficial. The university implausibly claimed such evidence was not relevant to the issue of whether sexual misconduct occurred. In doing so, MSU ignored John's repeated explanation that the evidence would demonstrate that no sexual misconduct ever occurred and that a false report had been filed. MSU later permitted the Friend's testimony to support Jane's allegation, even though it admitted this was not "directly related" to the issue of consent. Dr. Bourgeois oversaw and permitted those involved in the case to deny John his right to "have an equal opportunity to present relevant witnesses and other evidence." *See* the Policy at pg. 12. Faced with a suspension equal to the length of the entire college experience, John was entitled to strict adherence to the formal procedures in the Policy.

The value of additional safeguards in the disciplinary process is significant. While John could have significantly benefited from Dr. Bourgeois' adherence to the Policy, MSU has recently implemented an updated Sexual Misconduct policy. This new policy, effective since August 12, 2020, offers unmistakable additional protections. These additional safeguards amount to the difference between John's current situation and where he would be if never determined responsible. For example, the updated policy now clarifies that prior to any interview or meeting with either party, the university will provide written notice of the date, time, location, participants, and purpose at least 24 hours in advance. *See* a copy of the updated policy attached

as **Exhibit 1** to the Motion at 15. Had John been aware of the nature of the allegations against him, he would have been able to prepare for the meeting, be ready to answer questions, and have an advisor accompany him. The new policy even has a Conflicts of Interest provision, providing that if someone involved in the case is biased and unable to serve fairly and impartially, they can file a report with the Title IX coordinator. *Id.* Evidence of bias is now also a third ground for an appeal. *Id.* at 21.

The disciplinary process overseen by Dr. Bourgeois failed to place John on equal footing with Jane and denied him rights critical to survive the process. The Southern District recently noted that "[a] biased decision maker is constitutionally unacceptable." *Doe v. Univ. of Miss.* at 611 (internal alterations omitted). Further, the new policy effectively admits that the protections provided to John were insufficient and additional safeguards are critical.

> **d. MSU Defendants' interests do not surpass John's and the burden imposed by additional safeguards is low to nonexistent.**

Third, the MSU Defendants' interests pale in comparison those of John. John's reputation, academic career, and employment prospects are at risk of irreparable injury. Though they have an interest in overseeing the disciplinary process in accordance with the Code, this interest is not implicated because Dr. Bourgeois largely abandoned his responsibility to oversee fair student conduct proceedings in John's case. The MSU Defendants cannot be said to have a valid interest in a wrongfully-determined conclusion of responsibility. Further, the new sexual misconduct policy demonstrates that the burden imposed by additional safeguards is slight, if it exists at all. Because John was denied notice and a meaningful opportunity to be heard, and now is inflicted with a sanction tantamount to the entire college experience, John is highly likely to succeed on his due process claim.

### 3. <u>Violation of Substantive Due Process</u>

Lastly, John can more than meet his burden of establishing a *prima facie* case of a substantive due process violation by MSU. "To state a substantive due process claim, a plaintiff must show that the government's deprivation of a property interest was arbitrary or not reasonably related to a legitimate governmental interest." *Williams v. Tex. Tech. Univ. Health Sciences Ctr.*, 6 F.3d 290, 294 (5th Cir. 1993); *see also Pham v. Unic of La. at Monroe*, 194 F. Supp. 3d 534, 546 (W.D. La. 2016) ("The substantive due process analysis asks whether Defendants' conduct was so arbitrary as to shock the conscience."). "A dismissed student can succeed on a substantive due process claim if he shows that the university's decision was not careful and deliberate." *Doe v. Univ. of Miss.* at 614, *citing Guse v. Univ. of S.D.*, 2011 U.S. Dist. LEXIS 34621 at *13 (D.S.D. Mar. 20, 2011).

MSU Defendants' ratification of a noticeably flawed disciplinary process and resultant sanctions was not a careful or deliberate decision following a fair investigation. Rather, Dr. Bourgeois oversaw an investigation infected with bias and inequality between accuser and the accused. John's determination of responsibility followed a superficial investigation carried out with only Jane's interests in mind. Had John's suggested evidence been admitted to show that Jane's report was made in retaliation, or had he been given the benefit of the Policy's protections, the only plausible outcome would have been that the preponderance of the evidence standard was not, and could not, be met.

Dr. Bourgeois' sustaining the four-year suspension against John shocks the conscience. John submitted a thorough appeal request that outlined many procedural errors in the disciplinary and hearing process. John never waived in his assertion that Jane filed her false report in retaliation for John's actions. Regardless, MSU overlooked all facts that casted doubt on the

hearing outcome, and disregarded the emotional strain placed on John throughout his relationship with Jane and after with her false claim against him. MSU never offered any reason for its determination of responsibility. Dr. Bourgeois failed to offer any meaningful reason for his denial of John's appeal. In failing to do so, and in failing to describe why it deemed a four-year hold on John's education necessary, the sanction can only be described as arbitrary. By overseeing and participating in a process that served to corroborate Jane's vengeful allegation at the expense of John's future, Dr. Bourgeois acted in a manner that shocks the reasonable conscience. John is highly likely to succeed on the merits of this claim.

### B. John Will Suffer Irreparable Harm Absent Injunctive Relief.

Unless this Court grants John injunctive relief, John is certain to suffer irreparable harm. To demonstrate irreparable harm, a plaintiff must show that he is likely to suffer harm for which there is no adequate remedy at law. *Winter v. Natural Res. Def. Counsil, Inc.*, 555 U.S. 7, 20 (2008). A lost opportunity to continue with post-secondary education, coupled with the possibility that a student may be unable to pursue meaningful educational opportunities elsewhere while his name remains associated with sexual misconduct, inevitably affects professional prospects and cannot be compensated with money damages. *See Plummer v. Univ. of Houston*, 860 F.3d 767 at fn. 10 (5th Cir. 2017) (Judge Edith Jones, dissenting), *citing Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d 602, 622(E.D. Va. Feb. 25, 2016). Further, "[c]ertainly stigmatization as a sex offender can be a harsh consequence for an individual who has not been convicted of any crime, and who was not afforded the procedural protections of criminal proceedings." *Plummer* at fn. 10, *citing Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 602 (D. Mass. Mar. 31, 2016) ("If a college student is to be marked for life as a

sexual predator, it is reasonable to require that he be provided a fair opportunity to defend himself and an impartial arbiter to make that decision.").

The MSU Defendants have exposed John to harm from which he may never recover, absent injunctive relief. MSU branded John as a sexual predator, ignoring the considerable evidence to the contrary and the lifelong implications that such a title carries. John's life is on hold for the next four years as he waits to complete his three semesters of school before graduation. Even if John is able to conclude his studies, any potential employer will receive his academic record with this disciplinary finding. To assume that every, or even most, employers will give John the opportunity to explain himself is willful ignorance. John's mechanical engineering career may be over before it even started as a result of MSU's implicit trust in Jane's story. The very real danger in which John now finds himself cannot be compensated with monetary damages and constitutes irreparable harm.

### C. The Balance Of Hardships Favors John.

The balance of hardships dramatically favors John. An order vacating the sanction and clearing John's record will not harm the MSU Defendants more than John would be harmed absent injunctive relief. As described, John is facing irreparable injury to his reputation and academic career. John's ability to gain meaningful employment and earn a livelihood is now comprised, perhaps forever, before his career can even take off. No great hardship would be imposed on the university by John's return, as John only wishes to complete his final three semesters of classes. MSU also would not be burdened with keeping John and Jane separate because Jane has since graduated from MSU. Accordingly, the balance of equities lies strongly in favor of John.

**D.  The Public Interest Is Best Served By Granting Injunctive Relief.**

Lastly, injunctive relief in this case will promote the public interest. "The public interest is certainly served by promoting compliance with Title IX." *Doe v. Wood County Bd. of Educ.*, 888 F. Supp. 2d 771, 778 (S.D. W.V. Aug. 29, 2019), *citing Barrett v. West Chester Univ. of Pa. of State Sys. of Higher Educ.*, 2003 U.S. Dist. LEXIS 21095 at *15 (E.D. P.A. Nov. 12, 2003). Further, "[t]he public has a strong interest in the prevention of any violation of constitutional rights." *Favia v. Indiana Univ. of Pa.*, 812 F. Supp. 578, 585 (W.D. Pa. Nov. 2, 1992).

The public has an interest in ensuring that MSU's disciplinary process comports with the standards imposed by Title IX and the Due Process Clause. Public interest is also promoted in ensuring that an individual's reputation is not baselessly degraded due to false allegations of sexual assault. The public interest promoted by permitting a school to enforce its policies does not rise to the same level – the public's interest is necessarily diminished where the school's policies fall short. Granting John the injunctive relief he seeks would best serve the public interest.

**IV.    CONCLUSION**

John is at risk of irreparable harm and has met the criteria for preliminary injunctive relief. For the aforementioned reasons, John respectfully requests that his Motion for Preliminary Injunction be granted, MSU's sanction against him be lifted, and all reference to the disciplinary process and sanction be removed from his academic record.

Respectfully Submitted,

*/s/S. Ray Hill, III*
S. Ray Hill, III (MSB #100088)
Clayton O'Donnell, PLLC
1403 Van Buren Ave., Suite 103

P.O. Box 676
Oxford, MS 38655
P: (662) 234-0900
F: (662) 234-3557
E: rhill@claytonodonnell.com

Susan C. Stone*
Kristina W. Supler*
KOHRMAN JACKSON & KRANTZ, LLP
1375 E. 9th Street, 29th Floor
Cleveland, OH 44114
P: (216) 696-8700
F: (216) 621-6536
E: scs@kjk.com; kws@kjk.com

*Motion to Admit Pro Hac Vice pending
Counsel for Plaintiff John Doe

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Memorandum of Law in Support of Motion for Preliminary Injunction has been filed electronically on this 30th day of September, 2020.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties not receiving service through the Court's electronic filing system will be served by regular U.S. mail.  Parties may access this filing through the Court's system.

/s/S. Ray Hill, III
S. Ray Hill, III (MSB #100088)